**Leland C. BRENDSEL, Plaintiff,**

v.

**OFFICE OF FEDERAL HOUSING ENTERPRISE OVERSIGHT and Armando Falcon, Jr., Director Defendant.**

**No. 04–CV–00487 RJL.**

United States District Court, District of Columbia.

Aug. 30, 2004.

Brendan V. Sullivan, Jr., David M. Zinn, Kevin Michael Downey, Stephen Darren Andrews, Williams & Connolly LLP, Washington, DC, for Plaintiff.

Marcia N. Tiersky, Washington, DC, for Defendants.

## MEMORANDUM OPINION & ORDER

LEON, District Judge.

Plaintiff Leland Brendsel ("Brendsel"), former Chief Executive Officer of Freddie Mac, brings this action for declaratory and injunctive relief against the Office of Federal Housing Enterprise Oversight ("OFHEO") and Armando Falcon ("Falcon"), the Director of OFHEO. In addition, Brendsel has filed a Motion for a Preliminary Injunction seeking to enjoin OFHEO from ordering Freddie Mac to freeze nearly $60 million in employment benefits and assets payable to Brendsel under his employment agreement pending the outcome of various administrative hearings into his conduct while CEO of Freddie Mac. OFHEO opposes any injunction and has filed a motion to dismiss for lack of jurisdiction and failure to state a claim. Fed.R.Civ.P. 12(b)(1), 12(b)(6). Upon consideration of Brendsel's motion, OFHEO's opposition, and the remaining record before the Court, the Court DENIES OFHEO's Motion to Dismiss, GRANTS Brendsel's Motion for a Preliminary Injunction, and preliminarily enjoins OFHEO from enforcing its orders to Freddie Mac as explained below.

## I. BACKGROUND

Brendsel served as the CEO of the Federal Home Loan Mortgage Corporation ("Freddie Mac") for eighteen years. Pl. Mot. For Prelim. Inj. at 2. Freddie Mac was chartered by Congress in 1970 and Brendsel joined the company in 1982, when it was still a relatively small company. Id. at 3. In 1985, he became CEO, a position which he held until June of 2003. In 1989, Freddie Mac became a publicly traded company and it grew at a significant rate until Brendsel stepped down in 2003. Id.

On September 7, 1990, Brendsel entered into a written employment agreement with Freddie Mac governing the terms of his employment, including his compensation and termination provisions. Compl. ¶ 9. Brendsel was to receive compensation in various forms: a base salary, an annual bonus, an employee stock purchase plan, a stock compensation plan, a supplemental executive benefit plan, and an executive deferred compensation plan. Id. During his tenure, Brendsel purchased shares of Freddie Mac stock which were held in a custodial account for his benefit. Compl. ¶ 10. Brendsel was also periodically awarded restricted shares of Freddie Mac stock and restricted options to purchase shares of Freddie Mac stock. Compl. ¶ 11. Although Brendsel was permitted to vote the stock and exercise other rights of ownership, the stock and options were subject to forfeiture and were non-transferable during that time. Id. At a set date, the restrictions were to lapse, making the stock and options the full property of Brendsel. These assets were also held in a custodial account for Brendsel's benefit. Id. Finally, Brendsel deferred more than eight million dollars of his salary and bonuses such that they would be paid to him after his departure from Freddie Mac. Compl. ¶ 12.

Arthur Anderson served as Freddie Mac's outside independent auditor for most of the years that Brendsel was CEO. In 2002, and in the wake of the Enron scandal, the Audit Committee of Freddie Mac's Board of Directors replaced Arthur Anderson with PricewaterhouseCoopers ("PwC"). Compl. ¶ 13. In January 2003,

PwC informed Freddie Mac that it disagreed with the accounting for certain transactions during 2000, 2001, and 2002 and that there might have been a significant understatement of income. Id. Ultimately, on November 21, 2003, Freddie Mac issued restated financials for 2000, 2001, and 2002 reflecting net increase of five billion dollars in income. Compl. ¶ 14.

On June 6, 2003, Brendsel resigned at the request of the Board of Directors. Compl. ¶ 16. Although Arthur Anderson's accounting decisions had been reviewed and approved by professionals at Freddie Mac, there was no suggestion of wrongdoing by Brendsel. Indeed, Brendsel's resignation was considered to be for "good reason," and, as such, he was entitled to receive the entire termination package contemplated by his employment agreement. Compl. ¶ 17. Had Brendsel been terminated for "cause,"[1] he would not have been entitled to all of the benefits under his employment agreement. Id.

In 1992, two years *after* Brendsel entered into the relevant employment contract with Freddie Mac, OFHEO, an independent office located within Department of Housing and Urban Development ("HUD"), was created by The Federal Housing Enterprises Financial Safety and Soundness Act of 1992, 12 U.S.C. § 4501 *et seq.*, (the "Act") to provide federal regulation of Freddie Mac and Fannie Mae[2] (the "enterprises"). As part of its supervisory powers OFHEO has the authority to prohibit the enterprises from paying its executives compensation that is unreasonable or in excess of industry standards even

---

1. According to the employment agreement, termination for "cause" could be based upon: "(1) theft or embezzlement of Freddie Mac funds; (2) the conviction of a felony or misdemeanor involving moral turpitude; (3) improper disclosure of Freddie Mac's information; (4) unexcused failure to perform covenants under the agreement; or (5) 'any other willful or malicious conduct on the part of the Employee that is substantially injurious to Freddie Mac.'" Compl. ¶ 17.

2. The Federal National Mortgage Association.

though it can not actually set compensation levels for executives. 12 U.S.C. §§ 4513(b)(8), 4518(a). In addition, OFHEO was given the authority to approve termination packages *prior* to one of the enterprises entering into a compensation agreement. 12 U.S.C. § 4518(b). However, contracts that predated OFHEO's creation, such as Brendsel's contract, were explicitly exempted from this power. 12 C.F.R. 1770.1(b)(2).

On June 12, 2003, OFHEO's Director, Armando Falcon, issued a letter to Freddie Mac directing it to withhold the payment of any termination benefits to Brendsel. Compl. ¶ 23. That same day, another OFHEO official issued a letter to Freddie Mac directing it not to take any action to fulfill Brendsel's employment agreement as it related to termination benefits including the vesting of stock options. Compl. ¶ 24. On June 17, 2003, OFHEO sent a third letter to Freddie Mac ordering it to restrict all accounts held by Freddie Mac for the benefit of Brendsel, including previously vested stock options, deferred compensation, and other stock and options, in addition to the termination benefits already ordered to be held. Compl. ¶ 27. None of the letters cited any specific legal authority for withholding the funds aside from the OFHEO's general supervisory oversight of the executive compensation policies and practices of Freddie Mac. Compl. ¶ 23, 24, 27. On June 23, 2003, Brendsel's counsel made a written demand to Freddie Mac for the release of his property. Compl. ¶ 28. Freddie Mac's counsel responded by informing Brendsel that it was unable to comply with the request pursuant to OFHEO's instructions. Compl ¶ 29.

On December 17, 2003, OFHEO initiated an administrative enforcement proceeding against Freddie Mac, seeking to retroactively reclassify Brendsel's termination as for "cause," as opposed to for "good reason." Compl. ¶ 31. OFHEO brought a similar action against Brendsel which also sought civil penalties and restitution. Id. Any hearing on these administrative proceedings, however, are not scheduled to occur until 2006. Compl. ¶ 33. In the meantime, OFHEO did not conduct a hearing to review the appropriateness of freezing all of Brendsel's termination benefits and accounts held by Freddie Mac prior to the completion of these administrative proceedings.

The compensation involved in this case falls into three general categories. First, nearly $30,000,000 [3] in earned compensation which is being held by Freddie Mac to Brendsel's benefit in various forms, including: $8,684,000 of Brendsel's salary and bonuses that he had contributed to the deferred compensation plan; approximately $16,528,000 in stock and options which Brendsel had purchased in the employee stock option plan; and pension benefits in the amount of $4,357,000. Compl. ¶ 19. Approximately $4,000,000 worth of these option expire on June 2, 2004, and an additional $12,252,000 expire on July 6, 2005. Second, the employment contract provided that termination for "good reason" would cause previously-restricted stock and options to vest 30 days after Brendsel's termination, or July 6, 2003. Compl. ¶ 20. These assets total approximately $21,000,000, including $2,332,000 of stock options which expire on July 6, 2005. Third, the employment contract provided for the continuation of Brendsel's salary for 24 months following his resignation (totaling $2,360,000) and a prorated bonus for 2003 ($860,000), independent of the circumstances of Brendsel's compensation.

---

**3.** Monetary values for non-cash assets are based on the closing price of Freddie Mac stock on June 6, 2003, the day Mr. Brendsel resigned. Compl. ¶ 19.

Compl. ¶ 21. In light of the enormity of those benefits and accounts, it is not surprising, to say the least, that Brendsel brought this action seeking judicial review of OFHEO's order.

## II. JURISDICTION

Brendsel asserts that this Court has jurisdiction pursuant to 28 U.S.C. § 1331 because the case arises under the Fifth Amendment to the United States Constitution and the Administrative Procedure Act, 5 U.S.C. §§ 701–706. In its Opposition to the Motion for Preliminary Injunction and in a separate Motion to Dismiss, OFHEO advances a multi-pronged challenge to the Court's jurisdiction, asserting that the agency's statute limits the jurisdiction of the Court to interfere with its enforcement provisions prior to a final agency determination, that there has been no final agency determination, and that therefore the issue is not yet ripe for review. For the following reasons, the Court rejects the agency's reading of the applicable statutes and legislative history.[4]

■ First, OFHEO's reliance on section 4635(b) of Title 12 to support its contention that this Court has no jurisdiction pursuant to Congress's decision to limit judicial review of certain agency actions is, at best, misplaced. Section 4635(b) only limits this Court's authority "to affect, by injunction or otherwise" certain specifically enumerated actions by the agency.[5] Those noninterferable actions, however, do not include the decision by the agency to, in effect, freeze the plaintiffs' assets. Indeed, Brendsel is not alleging that OFHEO is acting pursuant to any of the proceedings listed in section 4635(b), but rather that OFHEO is acting entirely outside of it normal procedures and its statutory authority. Compl. ¶ 39, 40. And, as OFHEO conceded at oral argument, there has been no formal temporary cease-and-desist order issued in this case. Transcript of April 21, 2004 Motions Hearing ("First Mot. Hr'g Tr.") at 39. The resolution of the administrative proceedings currently pending against Brendsel and Freddie Mac will not be in any way deterred or delayed by a review by this Court of OFHEO's order to institute a *pre-judgment* attachment of Brendsel's property, an issue not under review in either of the pending administrative proceedings. Thus, while the ultimate result in this judicial action may affect Brendsel's right to exercise control over the assets in question pending the resolution of the administrative proceeding, it will not affect OFHEO's ability to either adjudicate the merits of those proceedings before it, or enforce a ruling adverse to Brendsel.[6] Therefore,

---

4. This appears to be the first case interpreting OFHEO's statutory authority since its creation in 1992. Additionally, this is apparently the agency's first enforcement action. See Def. Opp. at 12; First Mot. Hr'g Tr. at 6

5. Specifically, section 4635(b) of Title 12 states that, except as otherwise provided for by statute, "no court shall have jurisdiction to affect, by injunction or otherwise, the issuance or enforcement of any notice or order under section 4631[Cease–and–Desist Proceedings], 4632 [Temporary Cease–and–Desist Orders], or 4636 [Civil Money Penalty Proceedings] of this title, or subchapter II of this chapter [Required Capital Levels for Enter-

prises and Special Enforcement Powers], or to review, modify, suspend, terminate, or set aside any such notice or order."

While OFHEO does not explicitly limit this argument to the APA claim there is nothing in the language of the statute or in the legislative history that would imply that Congress intended to limit this Court's jurisdiction with regard to the Constitutional claim.

6. Moreover, there is no indication that restitution would be insufficient to satisfy such a ruling at the agency level. While an adverse ruling in the administrative proceeding would undoubtedly result in a fine against Brensdel, satisfaction of such a fine would not require

section 4635(b) does not limit the Court's jurisdiction in this case.

■ Second, OFHEO's contention that this Court lacks jurisdiction to review its order to Freddie Mac because it does not constitute a "final agency action" reviewable under the APA is equally unavailing. Brendsel is not seeking to review the merits of either of the ongoing administrative proceedings. If he were, he would need to do so under OFHEO's authorizing statute in the Court of Appeals for the D.C. Circuit, not the District Court. 12 U.S.C. § 4634(a). In determining whether this particular agency action by OFHEO was final, this Court need only look to "whether the agency has completed its decisionmaking process, and whether the result of that process is one that will directly affect the parties." *Franklin v. Massachusetts*, 505 U.S. 788, 797, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992). To say the least, the decisionmaking process, such as it was, regarding OFHEO's order to Freddie Mac was neither incomplete nor tentative. Considering the enormity of its impact, and its appearance of absolute finality, it is justly classifiable as a "final agency action" reviewable under the APA.

■ Finally, OFHEO argues that because of the ongoing nature of the two administrative proceedings, this Court is not presented with a controversy sufficiently ripe to warrant jurisdiction. At best, this argument appears disingenuous. When analyzing the ripeness of an issue, courts must consider "both the fitness of the issue for judicial decision and the hardship to the parties of withholding court consideration." *Ciba–Geigy Corp. v. U.S.E.P.A.*, 801 F.2d 430, 434 (D.C.Cir. 1986) (*citing Abbott Laboratories v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). That analysis requires the balancing of factors such as "whether the issue presented is a purely legal one, whether consideration of that issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final." *Id.* Because the question presented (whether OFHEO had the authority to order a pre-judgment attachment in the manner it did) is a purely legal one, with developed and largely uncontested facts, and because OFHEO's decision regarding pre-judgment attachment is final, the Court has no problem in concluding that this dispute is sufficiently ripe to warrant judicial review. Accordingly, for all of the above reasons, this Court finds that it has jurisdiction over this action and OFHEO's Motion to Dismiss[7] and focuses

the forfeiture of *specific* funds. Similarly, resolution of this case will not affect OFHEO's efforts to reclassify Brendsel's termination for "good reason" to a termination for "cause." In the event that the agency were to retroactively reclassify Brendsel's termination, his right to specific benefits would be implicated, but there is no indication that restitution would not be the appropriate and natural remedy, or that restitution would for some reason be impracticable.

7. OFHEO also argues that the Court lacks jurisdiction over Brendsel's Fifth Amendment claim under Rule 12(b)(6). A motion to dismiss under Rule 12(b)(6) questions whether the complaint has properly stated a claim.

See *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); Fed. R.Civ.P. 12(b)(6). The court will only dismiss a complaint for failure to state a claim if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C.Cir. 1994). In deciding such motions, the court must accept as true all well-pleaded factual allegations and draw all reasonable inferences in the plaintiffs' favor. See *Doe v. United States Dept. of Justice*, 753 F.2d 1092, 1102 (D.C.Cir.1985). Accordingly, the Court finds that Brensel has pled a Fifth Amendment

hereafter on plaintiff's motion for injunctive relief.

## III. STANDARD OF REVIEW

■■ To obtain preliminary injunctive relief, plaintiff's demand must be evaluated in relation to the extent to which it demonstrates the realization of one or more of the following factors: 1) a substantial likelihood of success on the merits; 2) an irreparable injury if the defendant were not enjoined; 3) a lack of substantial injury to other interested parties; and 4) a furthering of the public interest through the issuance of an injunction. *See CityFed Financial Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C.Cir.1995); *Mova Pharmaceutical Corp. v. Shalala,* 140 F.3d 1060, 1066 (D.C.Cir.1998). Plaintiffs need not make an equally strong showing as to each factor. Rather, the "factors should be viewed as a continuum—more of one factor compensating for less of another." *See Brown v. Artery,* 654 F.Supp. 1106, 1114 (D.D.C.1987). For the following reasons the Court concludes that the plaintiff has made the necessary showing in relation to one or more of these factors to warrant a preliminary injunction.[8]

### A. Substantial Likelihood of Success on the Merits

■ Brendsel vigorously contends that OFHEO "does not have the authority to create a prejudgment attachment on [his] compensation without any hearing or opportunity to be heard." Pl. Reply in Support of Mot. for Prelim. Inj. at 11. OFHEO, just as vigorously, asserts that it has the authority as a part of both its "plenary authority," under sections 4513(b)(8) and 4518, to prohibit the payment of excessive compensation to Freddie Mac's officers and under its "general supervisory authority" to ensure the safety and soundness of compensation agreements.[9] Def. Opp. to Pl. Mot for Prelim. Inj. at 15 n. 8 (*citing First National Bank of Eden v. Department of Treasury, Office of the Comptroller of Currency,* 568 F.2d 610 (8th Cir.1978), but not relying upon any specific statutory section). Since Congress did not explicitly provide this authority to OFHEO when it created the agency, the Court, pursuant to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), must determine whether Congress intended to *implictly* delegate this authority to OFHEO and, if

claim sufficiently to survive a 12(b)(6) dismissal, and accordingly, DENIES OFHEO's motion in that respect as well.

8. Because Brendsel has established a substantial likelihood of success on the merits of his APA claim, the Court finds that it unnecessary to judge the merits of the Constitutional claim at this stage of the proceedings.

9. OFHEO cites only an Eighth Circuit case interpreting another agency's authority to issue cease-and-desist orders and fails to cite any section of its own statute. *Id.* (citing *First National Bank of Eden v. Department of Treasury, Office of Comptroller of Currency,* 568 F.2d 610 (8th Cir.1978) (upholding an agency *cease-and-desist order* as being supported by substantial evidence)). The Court assumes

that OFHEO would point to section 4513(a), which states that "[t]he duty of the Director shall be to ensure that the enterprises are adequately capitalized and operating safely, in accordance with this chapter." Unlike subsection (b), which specifically grants the Director authority to make determinations and take necessary actions independent of the Secretary in enumerated circumstances, subsection (a) makes no such grant of authority to act. Moreover, subsection (c) makes clear that the authority granted in subsection (b) is exclusive and limited to the enumerated subjects. Thus, from a plain reading of the statute, subsection (a) can not be read to grant additional authority or expand the authority granted in subsection (b).

so, whether OFHEO's interpretation of the statute as providing it that authority implicitly is reasonable. For the following reasons the Court finds that Congress did not intend to implicitly include this authority among OFHEO's powers, and, even if Congress' intention was unclear, OFHEOs interpretation of this authority as implicit is not reasonable such that it would be entitled to deference under *Chevron*. Accordingly, the Court concludes that Brendsel has a substantial likelihood of success on the merits of his challenge to OFHEO's exercise of this authority under the APA.

For ease of discussion, the Court will review separately each of the potential statutory bases of authority relied upon by OFHEO in support of its interpretation.

### a. OFHEO's Authority to Prohibit the Payment of Excessive Compensation

In establishing OFHEO, Congress found that the "the continued ability of [Fannie Mae] and the [Freddie Mac] to accomplish their public missions is important to providing housing in the United States and the health of the Nation's economy" and that "more effective Federal regulation is needed to reduce the risk of failure of the enterprises[.]" 12 U.S.C. § 4501(2). Congress provided for the appointment of a Director generally charged with ensuring "that the enterprises are adequately capitalized and operating safely[.]" § 4513(a). The Director is also authorized, independent of the Secretary of HUD,[10] to make determinations and take actions necessary regarding certain subject matter areas, including "prohibiting the payment of excessive compensation by the enterprises to any executive officer of the enterprises under section 4518..." 12 U.S.C.

§ 4513(b)(8). Section 4518 prohibits the enterprises from providing compensation to any officer "that is not reasonable and comparable with compensation for employment in other similar businesses ... involving similar duties and responsibilities." 12 U.S.C. § 4518(a). However, the Director is not permitted to "prescribe or set a specific level or range of compensation." 12 U.S.C. § 4518(b). The Director also has the authority to approve in advance any employment compensation agreement that provides for payment of money or other things of value upon termination of employment. 12 U.S.C. § 1452(h)(2). The Director must ensure that the "benefits provided under the agreement or contract are comparable to benefits under such agreements for officers of other public and private entities involved in financial services and housing interests who have comparable duties and responsibilities" *Id.* This power was limited, however, to contracts entered into (or modified) *after* October 28, 1992. *Id.*

Section 4513, which OFHEO claims provides it with "plenary authority" to review executive compensation, *see e.g.* Def. Opp. at 15 n. 8, fails to provide specific enforcement mechanisms beyond simply stating that the Director may take whatever actions he deems necessary. For the Court to conclude that this section provides OFHEO with implicit plenary authority to review compensation, however, it would be necessary to ignore plain language in this very section of the statute which appears, *on its face*, to not only limit the Director's review of compensation to its reasonableness and its comparability to the rest of the industry but also prohibits the Di-

---

10. All other determinations, actions, and functions of the Director that are not specifically referred to in that subsection "shall be subject to the review and approval of the Secretary." 12 U.S.C. § 4513(c).

rector from setting specific salary levels.[11] Likewise, OFHEO's authority to approve termination benefit packages for executives is expressly limited to evaluating the comparability of those packages to industry standards and contracts entered into *after* OFHEO's creation.[12] The existence of these obvious limitations on OFHEO's authority makes it impossible for this Court, based on the statute's plain language, to conclude that OFHEO's power to review executive compensation is truly "plenary," especially as to employment contracts that preceded its existence. Indeed, it would seem that whatever action OFHEO planned to take *vis-à-vis* Brendsel would need to be tied to its authority to prohibit the payment of compensation that is unreasonable and/or excessive in relation to industry standards. Moreover, the fact that the plain language of the statute does not expressly authorize the Director to take such actions to *recover* past payments later determined to be excessive, also puts into question the basis of the Director's power here to recoup compensation that might be later found unreasonable during an administrative proceeding (e.g. in the stock option plan, the pension benefit plan, and the deferred compensation plan).

In any event, OFHEO's arguments that it has the power to freeze assets pending the outcome of the administrative proceeding in this case is simply overreaching. The administrative proceedings instituted here were neither brought pursuant to section 4518, nor instituted to review whether Brendsel's compensation was excessive or unreasonable. To the contrary, OFHEO seeks a possible reclassification of Brendsel's departure as "for cause," such that he would not have been entitled to recover certain portions of his benefits. Def. Opp. at 8. In the proceeding against Brendsel, OFHEO merely seeks civil money penalties for actions taken by Brensel in connection with the accounting irregularities and restitution of Brensel's bonuses for 2001 and 2002. Id. To the extent that OFHEO might seek restitution for past bonuses paid, the stated basis for its authority to do so is the unjust enrichment provision in section 4631(d)(1)(a), not its authority to review compensation for reasonableness or excessiveness under section 4513.[13] Pl. Mot. for P.I. Ex. 11 ¶ 27. Indeed, OFHEO first mentioned any concern about

11. OFHEO's argument that its power is "plenary" overstates its case. The relevant inquiry is not whether OFHEO's power with respect to compensation review is plenary (it is not), but rather whether its interpretation of the legislative history as providing it such authority is reasonable.

12. The parties disagree as to whether the assets at issue in this case are properly characterized and termination benefits or compensation. OFHEO contends that the distinction is irrelevant because the power to review excessive compensation is broad enough that it encompasses the payment of termination benefits at the time they are paid. In other words, OFHEO would have the authority to approve a termination package at the time the contract is entered into (after October 28, 1992) *and* at the time the package is dis-

bursed to the executive. Brendsel, on the other hand argues that the deferred compensation portion of the assets are unreviewable by OFHEO because they were approved in the year they were paid out. Brendsel also argues that as termination benefits, the assets in question are free from review under the compensation review authority.

13. The Notice of Charges states that Brendsel's actions created losses to Freddie Mac and that as a result Brendsel's bonus payments, which are tied to Freddie Mac's earnings, were inappropriate. This is different than a review of compensation for excessiveness, which would hinge instead on industry standards or overall reasonableness. The Notice of Charges makes no mention of these standards, nor does it cite its compensation review authority.

the reasonableness of Brendsel's compensation in its second supplemental brief in this litigation.[14] However, the implication of that statement, suggesting that any wrongdoing on the part of Brendsel would factor into a possible future review of Brendsel's compensation, does not even comport with its authority under sections 4513(b) and 4518 and is inconsistent with the explicit prohibition on the Director's setting specific compensation levels for employees and officers at Freddie Mac and Fannie Mae.[15]

In short, while the plain language of the Act permits OFHEO some latitude in taking prospective action to prohibit payment of excessive compensation, it does not explicitly authorize OFHEO to freeze assets of an employee in advance of an administrative hearing unrelated to the reasonableness of an individual's executive compensation. Whether such power is inherent in the grant of authority contained in section 4513(b) is a question requiring the Court to also look at the legislative

14. OFHEO asserts that only after the administrative proceeding is complete will the Director be able to ascertain the excessiveness of Brendsel's compensation. Def. Second Supp. Brief in Opp. at 10.

15. In its final brief, OFHEO makes the argument that wrongdoing on the part of an executive should be factored into its review of excessive compensation. Def. Reply in Supp. of Second Supp. Brief at 5. According to OFHEO, the proper comparison for industry standards would be to the compensation of a similarly situated CEO guilty of wrongdoing. This seems to be inconsistent with the language of the statute, which specifies that compensation should be comparable to "compensation for employment in other similar businesses involving similar duties and responsibilities." § 4518. In support of its reading, OFHEO submits a quote from Michigan Senator Carl Levin, the author of the provision, as support for this assertion:

In determining when compensation is excessive, the section requires the regulator to consider a number of factors including total compensation received by the executive, actual services performed, the enterprise's financial condition, compensation practices at comparable financial institutions such as banks, S & L's and other GSE's, any wrongdoing and other relevant matters. This language does not require the regulator to establish that an executive's compensation would cause an enterprise to fall below a minimum or adequate level of capital-that would be too difficult a burden to meet. Instead it authorizes the regulator to determine that compensation is excessive after considering each of the factors listed. These factors are similar to those which

must be considered for federally insured financial institutions. Again, the intent is to create compensation oversight practices which parallel those applicable to federally insured financial institutions.
138 Cong.Rec. at S8653. This passage clearly contemplates the inclusion of the relevant factors in the section of the statute. However, the version of the legislation eventually adopted by the Congress includes only one of the mentioned factors: "compensation practices at comparable financial institutions." Moreover, many of the factors above are required considerations of the other banking regulators in reviewing compensation for excessiveness, including "any connection between the individual and any fraudulent act or omission, breach of trust of fiduciary duty, or insider trading with regard to the institution;" and "other factors that the agency determines to be relevant." 12 U.S.C. § 1831p-1(c)(2)(F),(G). OFHEO's statute contains no such consideration for wrongdoing or a catch-all provision allowing OFHEO to identify other relevant factors.

Although OFHEO might argue that the compensation is unreasonable for an executive guilty of wrongdoing, the Court fails to see how they might set a reasonable compensation level for such an executive. In those circumstances, the question would likely be whether he should have been compensated at all under a breach of contract theory. Indeed, Freddie Mac would be free to sue Brendsel on the theory that he failed to actually earn his compensation under his contract. Any restitution sought by Freddie Mac would more properly be characterized as unearned compensation or unjust enrichment than excessive or unreasonable compensation.

history behind OFHEO's authority to issue cease-and-desist orders.

### b. OFHEO's Authority to Issue Cease-and-Desist Orders

OFHEO relies principally on the argument that its power to effect a pre-judgment attachment is implicit in its authority to issue permanent and temporary cease-and-desist orders. See Def. Reply in Support of Second Supp. Brief at 6. Section 4631 gives the Director the authority to issue a permanent cease-and-desist order to an enterprise, or one of its executive officers, to stop certain limited types of conduct: 1) "conduct that threatens to cause a significant depletion of the core capital of the enterprise" (§ 4631(a)(1)); 2) conduct that violates various laws, regulations or agreements that are binding on the enterprise (§ 4631(a)(3)); and 3) conduct by an officer that would require restitution to the enterprise (i.e. unjust enrichment or other conduct that subjects a party to civil money penalties under the Act, such as causing harm or loss to the enterprise) (§ 4631(a)(2), (d)(1)). To issue a permanent cease-and-desist order, the Director must serve a notice of charges and provide a hearing. 12 U.S.C. § 4631(c)(1). If on the record at the hearing the Director finds that the conduct or violation specified in the notice of charges was established, the Director may issue and enforce an order requiring "such party to cease and desist from any such conduct or violation and to take affirmative action to correct or remedy the conditions resulting from any such conduct or violation." 12 U.S.C. § 4631(c)(2). OFHEO has in fact brought such proceedings against Freddie Mac and Brendsel under this section.

In certain limited circumstances, OFHEO can also issue a *temporary* cease-and-desist order, under section 4632, in advance of the hearing on the permanent cease-and-desist order, under section 4631. Specifically, if the conduct or violation alleged in the notice of charges is likely to:

(1) to cause insolvency, (2) to cause a significant depletion of the core capital of the enterprise, or (3) otherwise to cause irreparable harm to the enterprise, prior to the completion of the proceedings conducted pursuant to section 4631(c) of this title, the Director may issue a temporary order requiring the enterprise, executive officer, or director to cease and desist from any such conduct or violation and to take affirmative action to prevent or remedy such insolvency, depletion, or harm pending completion of such proceedings.

OFHEO contends that "[t]hose actions which OFHEO can accomplish through formal means, such as cease and desist orders, may also be accomplished informally if the enterprise willingly complies with OFHEO's supervisory directives." Def. Second Supp. Brief in Opp. at 6; *see also* Def. Supp. Brief at 3. In arguing so, however, OFHEO misconceives the statutory issue before the Court as being one of formality versus informality. To the contrary, the issue is whether OFHEO was intended by Congress to be able to accomplish this action through *informal* means. The temporary cease-and-desist authority, on its face, authorizes pre-judgment attachment only under certain narrow circumstances, none of which are present in this case. It is axiomatic that "administrative agencies are vested only with the authority given to them by Congress." *Gibas v. Saginaw Min. Co.*, 748 F.2d 1112, 1117 (6th Cir.1984). Because the scope of an implied authority can not, and should not, exceed that of the express authority from which it flows, OFHEO can not informally effect a tempo-

rary hold under circumstances where it is unable to effect a formal one.

OFHEO's informal procedures here diverge from the formal ones in another important way: an enterprise, executive officer, or director that has been served with a temporary cease-and-desist order can challenge the order *in this Court.* 12 U.S.C. § 4632(d). Although OFHEO argues that Freddie Mac was free to disobey its letters in this case, a simple review of the language in the letters reveals that OFHEO was ordering, not suggesting, that it refrain from "any action to fulfill any of the terms of" Brendsel's termination agreement and to restrict all of Brendsel's accounts at Freddie Mac. See Compl. Ex. 7, 8. In the absence of procedural safeguards allowing Freddie Mac to challenge such a directive, it is patently unrealistic, if not naive, to expect Freddie Mac to do anything other than comply.

Lastly, OFHEO insists that, notwithstanding Congress's failure to explicitly provide it such powers, they are implicit nevertheless because OFHEO was modeled on other banking regulators (i.e. the Office of Thrift Supervision ("OTS") and the Office of the Comptroller of Currency ("OCC")) which do have the power to effect pre-judgment attachments. Interestingly, however, the statute which authorizes the agencies to which OFHEO refers requires those agencies to follow specific requirements before freezing assets in advance of a full administrative hearing. *See e.g.* 12 U.S.C. § 1818(i)(4). For example, each agency must apply to a federal court to obtain a freeze of assets and must satisfy the standards of Rule 65 (excepting the requirement of irreparable injury). It is inconceivable to this Court that Congress intended to give the same authority to OFHEO, implicitly, without those, or some other, procedural safeguards.

In short, the legislative history fails to provide support for OFHEO's reading of its statute. "[A]n administrative agency's power to regulate must always be grounded in a valid grant of authority from Congress." *FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 161, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000). "Where Congress knows how to say something but chooses not to, its silence is controlling." *In re Griffith,* 206 F.3d 1389, 1394 (11th Cir.2000) (en banc). Accordingly, the Court concludes that Congress did not intend to grant to OFHEO the power to effect a freeze of assets in the manner in which it did in this case.

■■■ However, even if it were the case that Congress' intent with regard to OFHEO's authority to freeze assets was less clear or vague, OFHEO's conclusion that this power is implicit would nonetheless fail to survive the Courts analysis under the second step of *Chevron* because OFHEO's actions in this case rest upon an unreasonable and untenable interpretation of its enabling statute. What OFHEO is attempting to do, in essence, is use its authority to review compensation to justify ordering Freddie Mac to freeze all of Brendsel's assets that are within Freddie Mac's control without regard to the status of any of the particular type of assets (e.g. whether the assets represent past compensation that is already the property of Brendsel or whether the termination benefits in question are properly characterized as compensation such that OFHEO has any review authority at all).[16] OFHEO has ordered this freeze to continue, not until it has an opportunity to review Brendsel's compensation package compared to industry standards, but until after the administrative proceedings are complete so that it can then determine, based

**16.** The Court is not ruling on either of these questions.

on any wrongdoing established at that hearing, whether his compensation is appropriate. Moreover, OFHEO is doing this despite its acknowledgment that the sections of the statute under which it has brought charges provide no such mechanism, and the administrative proceeding only implicates a portion of the termination benefits to which Brendsel would no longer be entitled if he were terminated for cause: an amount far less than the total amount retained by Freddie Mac at OFHEO's direction. Under any interpretation of its authority, implicit or explicit, freezing assets which are not recoverable in order to enable the Administrative Law Judge to fashion a remedy at the conclusion of that proceeding is patently unreasonable. First Mot. Hr'g Tr. at 52; Def. First Supp. Br. at 13–14 (arguing that, although the Notice of Charges only seeks $5.8 million in civil money penalties, OFHEO should be able to retain control of the remainder of the assets in case it decides to seek more penalties or bring more charges in the future); Def. Reply in Support of Second Supp. Br. at 4 (the "compensation package" being held "needs to be available to the [ALJ] to fashion an appropriate remedy"). Simply stated, OFHEO's statutory interpretation is not entitled to deference under the reasonableness standard provided by *Chevron.*

## B. Irreparable Injury to the Plaintiff

 Brendsel also alleges that he will suffer irreparable harm because portions of his compensation represented by stock options will expire prior to the resolution of the administrative hearing and will be unrecoverable. In addition, he argues that the unlawful deprivation of his property, although possibly temporary, amounts to irreparable harm as well. OFHEO argues that any harm in this case can be reduced to a monetary amount, and as such cannot form the basis for irreparable harm. While it is well-established that the "possibility that adequate compensatory or other corrective relief will be available at a later date ... weighs heavily against a claim of irreparable harm," *Virginia Petroleum Jobbers Ass'n v. Fed. Power Comm'n,* 259 F.2d 921, 925 (D.C.Cir.1958), it is of no avail in this case where the plaintiff will be unable to sue to recover any monetary damages against either Freddie Mac or OFHEO. For example, to the extent that Brendsel might seek to sue Freddie Mac on a breach of contract theory, Freddie Mac would likely present the defense that it was acting pursuant to OFHEO's order. This defense is potentially valid even though the orders themselves may be illegal. *See e.g., Eastern Air Lines, Inc. v. McDonnell Douglas Corp.,* 532 F.2d 957, 994 (5th Cir.1976). Meanwhile, OFHEO is immune from suit because there is no relevant waiver of sovereign immunity permitting it to be sued on these claims. *See e.g. Kansas Health Care Ass'n v. Kansas Dep't of Soc. & Rehab. Servs.,* 31 F.3d 1536, 1543 (10th Cir.1994); *Temple Univ. v. White,* 941 F.2d 201, 215 (3rd Cir.1991). At the hearing, OFHEO suggested that Brendsel might be able to sue under the Federal Tort Claims Act ("FTCA"). Mot. Hr'g, April 21, 2004 at 56:1–7. In response, Brendsel points out that the FTCA does not in fact provide a relevant waiver of sovereign immunity because claims based on interference with contracts rights are expressly excepted from the FTCA, *see* 28 U.S.C. § 2680(h), and the Supreme Court has held that Constitutional torts are not "cognizable" under the FTCA. *FDIC v. Meyer,* 510 U.S. 471, 477–78, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Furthermore, even if Brendsel were able to identify another sustainable tort theory, OFHEO would likely be shielded by the "discretionary function" exception to the FTCA,

which provides immunity even if the regulation involved is invalid or if the agency action was an abuse of discretion. 28 U.S.C. § 2680(a). Simply stated, the FTCA does not appear to be a viable avenue of future recovery for Brendsel and no other alternatives appear to offer Brendsel the ability to recover for the damages that he will incur if his stock options are allowed to expire, or for any other damages that will materialize as a result of the interim deprivation of the assets at issue in this case. Thus, the Court finds that the likelihood of irreparable financial harm to Brendsel is more than sufficient, especially when considered together with the other factors, to justify an injunction in this case. Because of this, the Court will deal only briefly with the remaining two factors.

## C. Lack of Substantial Injury to OFHEO and Lack of Harm to the Public Interest

 The remaining factors for a preliminary injunction also weigh in Brendsel's favor. First, there is no indication that OFHEO or Freddie Mac, for that matter, would be harmed by the injunc-

tion. Indeed, Freddie Mac's financial well-being certainly will not be threatened by the release of these assets to Brendsel, and Freddie Mac may have been willing to release these assets to Brendsel absent an order from OFHEO to the contrary. OF-HEO, of course, still retains the power to issue a temporary cease-and-desist order to Freddie Mac if it is able to establish that it is warranted under the standards set forth in the statute.[17] To date, however, OFHEO's has utterly failed to establish that Brendsel would be unable to satisfy any future restitution that an administrative ruling may issue, further highlighting the weakness of OFHEO's position. Finally, the public has a profound interest in ensuring that: (1) OFHEO acts within the limits on its authority established by Congress; and (2) that those whose assets might be frozen by OFHEO are accorded a fair modicum of due process. Accordingly, for all of these reasons, the Court GRANTS Brendsel's motion for a preliminary injunction.

## IV. ORDER

For the reasons set forth above, it is this 30th day of August hereby

17. OFHEO claims that if it were to issue a temporary cease-and-desist order, only Freddie Mac would have standing to challenge the order in court under section 4632, leaving Brendsel with no remedy. Def. First Supp. Br. at 9. As support, OFHEO relies on the D.C. Circuit's opinion in *Ridder v. Office of Thrift Supervision*, 146 F.3d 1035 (D.C.Cir. 1998). In that case, former bank officers sought to enjoin enforcement of a temporary cease-and-desist order issued by OTS which prevented the bank holding company from paying their legal expenses. The court held that only the party to whom the order was directed could challenge the order under the statute. Although an exception to the rule exists if the third party can make a " 'strong and clear' showing that the issuance of the Temporary Order violated their constitutional rights," 146 F.3d at 1041 (citing *McCulloch v. Libbey–Owens–Ford Glass Co.*, 403 F.2d 916, 917 (D.C.Cir.1968)), the court noted that the

Fifth Amendment's Due Process Clause applies only to direct government appropriation, and not to "indirect adverse effects of government action." *Id.* (quoting *O'Bannon v. Town Court Nursing Ctr.*, 447 U.S. 773, 789, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980)). However Brendsel argues that his property interest in the assets in this case have already vested and, as a result, OFHEO's order to freeze them constitutes a direct deprivation of his property without due process of law. Without ruling on the threshold issue of whether Brendsel has a sufficient property interest in the frozen assets to prevail on a Fifth Amendment claim, the Court believes that Brendsel can likely satisfy the heightened threshold requirement to bring a challenge to a cease-and-desist order as broad as the informal action already taken by OFHEO. *Cf.* note 7 *supra*, finding that Brendsel's Fifth Amendment claim survives a 12(b)(6) motion to dismiss.

ORDERED that defendants' Motion to Dismiss [# 17] is DENIED; and

ORDERED that plaintiff's Motion for a Preliminary Injunction [# 2] is GRANTED; and it is further

ORDERED that OFHEO is hereby enjoined from ordering, directing or suggesting, through any informal procedure not statutorily defined, that Freddie Mac withhold those assets and funds to which Brendsel is presently entitled under his employment agreement.

SO ORDERED.